**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID MOLLO,<br>        Plaintiff,<br><br>    v.<br><br>PASSAIC VALLEY SEWERAGE<br>COMMISSIONERS, et. al.,<br>        Defendants. | Civ. No.  07-1655 (DRD)<br><br><br>**O P I N I O N** |

*Appearances by:*

Andrew Rubin, Esq.
96 Park Street
Montclair, NJ 07042

>    *Attorney for Plaintiff,*

CHASAN, LEYNER, BARISO & LAMPARELLO, PC
by:  John L. Shahdanian II, Esq.
Raymond J. Seigler, Esq.
300 Harmon Meadow Boulevard
Seacaucus, NJ 07094

>    *Attorneys for Defendants.*

**DEBEVOISE, Senior District Judge**

The underlying dispute in this case arises from David Mollo's termination from

employment as a landscaper for the Passaic Valley Sewerage Commission ("PVSC"), by the

Defendants, Passaic Valley Sewerage Commissioners, Anthony W. Ardis, Frank J. Calandriello,[1]

Alan C. Levine, Anthony J. Luna, Angelina M. Paserchia,[2] Kenneth R. Pengitore, and Thomas

Powell (collectively, "Defendants" or "Commissioners").  The PVSC manages and regulates the

collection and disposal of wastewater generated in a four-county area along the Passaic Valley

---

[1] Mr. Calandriello's surname was incorrectly spelled in the case caption as "Calindriello."
[2] Ms. Paserchia's first name was incorrectly spelled in the case caption as "Angela."

River Basin.  Defendants suspended and subsequently terminated Mollo after he tested positive for marijuana, cocaine, and phencyclidine (PCP) in a drug test randomly administered by the PVSC.  The Complaint, filed in the Superior Court of New Jersey, Law Division, Essex County, and removed to this Court by Defendants, alleges violations of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the New Jersey Constitution, on the basis that the PVSC's drug testing policy constituted an illegal search and seizure; conspiracy to deprive Mollo of his constitutional rights; wrongful termination in violation of New Jersey's Law Against Discrimination ("LAD"); and breach of contract and the covenant of good faith and fair dealing.  Defendants seek summary judgment on all the claims, arguing that the privacy intrusion involved in its drug-testing policy is justified because the policy is reasonable and necessary to protect both employees and the public; Mollo's continued drug use disqualified him from categorization as disabled under LAD; and Mollo's contract claims and conspiracy claims are unsubstantiated.  Mollo counters that his duties as a landscaper are not in fact safety sensitive; the drug test was unreasonable because it was administered randomly; he was disabled when terminated because he was enrolled in a rehabilitation program; and Defendants violated a contract between the parties by calling him back to work before he had completed the rehabilitation program.  Defendants' motion for summary judgment is granted on all of Mollo's claims.  Summary judgment is granted for the search and seizure claims because even taking the facts in the light most favorable to Mollo, the Court finds that his duties were safety-sensitive, for the discrimination claim because Mollo did not qualify as disabled due to his continued drug use, and for the contract and conspiracy claims because they are legally insufficient.

## I.  BACKGROUND

The PVSC Commissioners terminated Mollo from his position as a landscaper for the PVSC effective December 15, 2005.  He filed the Complaint in the Superior Court of New Jersey, Law Division, Essex County, on February 26, 2007.  The Complaint alleges six counts against Defendants, including (1) violation of Mollo's rights under the Fourth and Fourteenth amendments to the United States Constitution, pursuant to 42 U.S.C. §§ 1983, 1985 and 1988; (2) violation of Mollo's right to be free of unreasonable searches and seizures under Article I, Paragraph 7 of the New Jersey Constitution; (3) violation of New Jersey's Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1, et seq.; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing; and (6) conspiracy to violate Mollo's civil rights pursuant to 42 U.S.C. §§ 1983 and 1985.  Mollo seeks damages for lost wages, front pay, back pay, emotional distress, punitive damages, and attorney's fees.

On April 10, 2007, Defendants filed to remove the case to this Court, properly claiming that the Court has original subject matter jurisdiction over the claims that arise under §§ 1983, 1985 and 1988.  See 28 U.S.C. § 1331.  The Court has jurisdiction over the remaining state law claims because they arise out of a common nucleus of operative facts, namely the random drug testing policy and Mollo's resultant suspension and termination.  See 28 U.S.C. § 1367.  The parties commenced discovery, which continued into 2009.  On August 25, 2009, Defendants filed the present motion for summary judgment.  On October 19, 2009, the Court held oral arguments on the motion.

The PVSC is a body politic and corporate created in 1902 by the State of New Jersey, pursuant to N.J. Stat. Ann. §§ 58:14-1.  The PVSC has the power to sue and be sued, to acquire, hold, use and dispose of real and personal property, as well as all other power and authority proper and necessary to carry out its purposes.  N.J. Stat. Ann. § 58:14-2.  The PVSC is directed

by a Board of Commissioners appointed by the Governor and confirmed by the State Senate. The PVSC maintains an extensive sewer system and operates its wastewater treatment plant in Newark with the capacity to treat 330 million gallons of wastewater per day.  The plant contains more than eight miles of access roads, more than one mile of 15-foot-wide utility tunnels, miles of sewers and storm drains, miles of process pipes, thousands of instruments and valves, hundreds of pumps, and a 450 foot-long bridge over Doremus Avenue.  (Marshall Aff. ¶ 6.)

Defendants hired Mollo in July, 2002 as a maintenance worker.  He was promoted to a landscaping position within the Maintenance Department in 2005.  The purpose and primary function for a PVSC Landscaper is stated by the PVSC as:

> Responsible to operate various types of motorized landscaping equipment.  To perform manual and unskilled laboring work, in connection with landscaping tasks.

(App. C to Shah. Cert.)  The principal duties of the Landscaper position are:

1. Responsible to operate various types of motorized landscaping equipment. Performs labor work in connection with landscaping tasks.
2. Drives a vehicle to transport materials and to perform snow removal duties
3. Must be available for emergencies or job assignments on a 24 hours basis.
4. Follows Policies, Procedures, Rules and Regulations as outlined in the PVSC Personnel Policies and Procedures Manual
5. Other duties as assigned.

(Id.)  The position specifications include:

> Must be able to operate equipment in a skilled and safe manner over rough, icy and unstable surfaces.
>
> […]
>
> Must be in good health and be free from disabling physical and mental defects which would impair the proper performance of the required duties or which might endanger the health and safety of oneself or others.

(Id.)

The PVSC employs five full-time Landscapers to perform the necessary upkeep of the facility.  (Marshall Aff. ¶ 7.)  Martin Marshall, as the PVSC's Superintendent of Maintenance, supervised Mollo at the PVSC.  Marshall states that Landscapers are required to work throughout the entire property.  Landscapers cut the grass using push mowers, weed-whackers and riding mowers.  (Marshall Aff. ¶¶ 8, 9, 11.)  They also remove snow and ice from walkways, driveways, and all points of access to the facility's buildings and equipment.  (Id. ¶ 10; Habrukowich Aff. ¶ 7d.)  At times they remove snow from the facility's access roads, parking lots, and the bridge over Doremus Avenue.  (Marshall Aff. ¶¶ 8, 9, 11.)  For snow removal, Landscapers use snow-plows and other modes of snow removal.  (Id.)  Additionally, Landscapers operate motor vehicles to travel to and from their various tasks.  (Id. ¶ 10.)

Landscapers perform their work in parts of the facility that are in the vicinity of potentially dangerous machinery, such as a cryogenic plant,[3] electrical substation,[4] Archimedes screw pumps,[5] and primary and final clarifiers[6] (tanks that hold and treat sewage).  (Id. ¶ 8, 9, 11.)  Numerous dangers are inherent when employees work in the vicinity of those machines and the facility generally.  (Habrukowich Aff. ¶ 7.)  For instance, the facility stores hazardous and combustible chemicals.  (Id. ¶ 7a.)  Due to the gasses extracted from the raw sewage treated by the facility, the air in portions of the plant can be poisonous.  (Id.)  Employees are required to read meters that are placed in plain view to warn them of any danger to breathing the air in a given area.  (Id.)  Were an employee to expose the stored oxygen in the cryogenic plant to a

---

[3] The cryogenic plant is a part of the oxygen production facility.  (Habrukowich Aff. ¶ 7.)  It separates nitrogen from the air and stores pure oxygen for use in breaking down raw sewage.  (Id.)

[4] The largest substation at the PVSC is a 134,500 volt facility.  (Id.)

[5] There are six Archimedes screw pumps that elevate sewage entering the plant to a height of 38 feet.  (Id.)

[6] The final clarifiers contain bridges that pass over the tank, which is exposed to the open air.  (Id.)  Thus, it is sometimes necessary for employees to remove ice and snow from such bridges.  (Id.)

flame or spark, a fire could occur, potentially resulting in injury or death to any person in the vicinity.  (Id. ¶ 7b.)  Further, damage to the plant would result in interruption of sewage treatment to the PVSC's 1.3 million customers.  (Id.)  A Landscaper could be electrocuted if exposed to "buss work" outside of the electrical substation, while performing landscaping nearby.  (Id. ¶ 7c.)  A Landscaper called upon to remove ice from the bridges that run over the clarifying tanks could fall from the bridge into the tanks, which could cause death or injury by exposure to sewage, being crushed by machinery, or drowning.  (Id. ¶ 7d.)  The area around the Archimedes screw pumps also needs to be landscaped, and an employee who falls into the screw pump could be crushed or drown in sewage.  (Id. ¶ 7e.)

Marshall states that Mollo was responsible for performing duties outside of his direct watch or the direct watch of his co-workers.  (Marshall Supp. Aff. ¶ 5.)  Specifically, he sometimes had passengers in a PVSC truck he was operating, while at other times, he operated the vehicle alone.  (Id. ¶ 6.)  While operating PVSC snow plows, Mollo was customarily alone. (Id. ¶ 7.)  Mollo states that most of his work was done as part of a crew and not individually. (Id.)

The PVSC required Mollo to undergo training in hazardous substances, emergency preparedness, confined spaces entry, and fire prevention.  Although Mollo states that he was not trained to "respond to emergencies" or "in any aspect of firefighting," (Mollo Decl. ¶ 5.), Defendants provided the Court with forms signed by Mollo acknowledging his attendance at safety courses, including the Fire Prevention Safety Program, Emergency Preparedness Program, Confined Spaces Entry Compliance Program, and Self Contained Breathing Apparatus Training Program.  (App. A to Keogh Aff.)  Additionally, the PVSC tested Mollo's knowledge of the relevant subject matter following each training program.  (Keogh Aff. ¶ 8.)  Marshall states that

Landscapers are trained to operate a Tri-Tector recorder and that when a maintenance crew is entering an enclosed space, a trained employee must measure for airborne toxins.  (Marshall Aff. ¶ 12.)  Mollo contends that all of this training was related to his own personal safety and that he was not trained to secure the safety of others.  (Mollo Aff. ¶ 6.)

On his first day of work, Mollo acknowledged, by his signature, receipt of the PVSC Personnel Policy and Procedures Manual ("Personnel Manual"), which contains a section titled "Employee Drug Abuse," that states, in relevant part:

> An employee who, based on reasonable cause, has been determined during working hours to have unlawfully been in possession of, or used a controlled substance, or who reports to work after unlawfully using, or under the influence of, a controlled substance, may be directed by the appropriate supervisor to report to a designated healthcare professional, for a medical evaluation which may include a blood and/or urine test for the presence of controlled substances.

(App. B.)

In July 2005, in response to anonymous verbal reports of drug and alcohol use by people at the facility, the PVSC issued a new random drug testing policy.  (Mayo Dep. 52:9-13, May 1, 2008; Christiansen Dep. 17:13-22, April 23, 2009.)  The policy was developed by Harry Mayo, the Director of Human Resources for the PVSC, and Brian Christiansen, the Executive Director of the PVSC, in consultation with the PVSC's lawyers, and was approved and adopted by the Commissioners.  (Mayo Dep. 26:3-21.)  The policy was designed to cover "safety sensitive" positions only, as defined in a legal memorandum and oral conversations with the PVSC's lawyers.  (Christiansen Dep. 21:12-22:12.)   Based on that advice, the new policy was designed so that all employees who work in the facility near operating equipment and machinery—as opposed to administrative employees who work indoors in an office building—were deemed to have "safety sensitive" duties and would be subject to random testing.  (Id. 20:8-18.)

On July 28, 2005, PVSC distributed notice of the new random drug testing policy to all employees.  The new policy applied to "all PVSC employees whose job duties include the performance of safety sensitive functions, as determined by the PVSC."  (App. D.)  The notice stated that testing would begin on September 1, 2005.  The policy stated that all "eligible employees" would be tested during the first year of the program, and 50% would be tested each year thereafter.  (<u>Id.</u>)  The stated purpose of the policy was "to maintain a drug-free workplace….to create a safe working environment free from the effects of drugs….to promote and maintain the safety of the public and PVSC employees."  (<u>Id.</u>)  The policy stated that the employee would produce the urine sample without observation by a monitor, unless the monitor had reason to believe that the employee would adulterate the specimen.  (<u>Id.</u>)  Under such circumstances, the production of the sample should be observed by a person of the same sex as the employee, and the facts underlying the belief that tampering might occur must be documented.  (<u>Id.</u>)

Mollo was out of work on medical leave when the policy was disseminated to the employees.  (Mollo Decl. ¶ 3.)  Mollo returned to work on or about September 29, at which time he was given a copy of the policy.  (<u>Id.</u>)  He was required at that time to submit to drug testing or be terminated, so he signed his name acknowledging receipt of the policy and gave a urine sample.  (Mollo Decl. ¶ 3; App. D, E to Shah.)  The parties agree that the reason for the test was the new policy, and not reasonable suspicion.  (Mayo Dep. 28:6.)  Mollo tested positive for marijuana, cocaine, and PCP.  (App. E to Shah. Cert.)  Mollo does not dispute the accuracy of the results.

The PVSC Human Resources Department received the test results on October 6.  On October 7, Christiansen informed Mollo by letter that as a result of the positive drug test, he

would be suspended immediately.  (App. F.)  The letter gave Mollo the option of either

requesting a hearing to dispute the results, or signing a standard "Stipulation of Settlement"

admitting guilt, which would allow him to return to work on a probationary basis, provided that

he enter a treatment program under the direction of PVSC's Employee Assistance Program.  (Id.)

Further, the letter stated that:

> [S]hould you at any time in the future test positive or refuse testing for either
> drugs or alcohol, or should you fail to follow the directives of the Employee
> Assistance Program…you will not again be offered this alternative, and will
> instead be terminated.

Mollo chose to sign the Stipulation of Settlement ("Stipulation").  The Stipulation, executed by

Mollo and the Human Rights Director before two witnesses on October 25, 2005, stated:

> On October 7, 2005, Landscaper David Mollo was indefinitely suspended for his
> failure to pass the drug test given to him on Thursday, September 29, 2005 in
> accordance with the Random Drug Testing Police of the Passaic Valley Sewerage
> Commissioners (PVSC).  The Passaic Valley Sewerage Commissioners and
> David Mollo agree to the following terms for resolving Mr. Mollo's Indefinite
> Suspension:
>
> 1. Mr. Mollo admits the factual basis for the charges filed against him.  He
>    stipulates that he reported to work on September 29, 2005 having ingested
>    three (3) different illegal substances in violation of PVSC's Rules and
>    Regulations and its Random Drug Testing Policy.
>
> 2. Mr. Mollo acknowledges that he shall be placed on indefinite probation with
>    such probation to be reviewed on an annual basis to determine whether there
>    is sufficient improvement to warrant removing him from probation.  Mr.
>    Mollo further acknowledges that he will not receive range or step increases
>    during the period he is on indefinite probation.
>
> 3. Mr. Mollo acknowledges that he must be assessed by PVSC's Employee
>    Assistance Program and follow their treatment directives, and must sign any
>    necessary releases to insure that PVSC is able to monitor his progress.  He
>    further agrees that he shall be subject to random drug testing on a more
>    frequent basis than the general PVSC safety sensitive population, and that
>    should he fail a drug test or fail to report for any recommended treatment, or
>    should he fail to faithfully carry out any programs or directives dictated by the
>    Employee Assistance Program, he will be subject to immediate termination.
>    He additionally acknowledges that should he be charged with any infraction

of PVSC Rules and Regulations, and if such charge is sustained, he is also subject to immediate discharge.

4.  If Mr. Mollo agrees to immediate drug and alcohol tests by PVSC's doctors, and if those tests are negative, he will be permitted to return to work on Wednesday, November 2, 2005, subject to the ratification by the Commissioners of his right to do so.  All time lost prior to such date of return will be deemed to be punishment for the infractions that are the subject matter of this Stipulation.

5.  This agreement is contingent upon approval by the Commissioners at their next regularly scheduled meeting on November 9, 2005.  In the event the Commissioners do not approve this agreement, Mr. Mollo shall immediately be returned to Indefinitely Suspended status, and shall have the right to a hearing on all issues involved in this action and this settlement agreement will be null and void.

Mr. Mollo acknowledges that he understands the terms and conditions of this Agreement.  He further acknowledges that PVSC has advised him that he may consult with an attorney prior to executing this Settlement Agreement, and that he is entitled to a reasonable period of time within which to consider this Agreement prior to signing.

Mollo enrolled and on October 31st began participation in an outpatient substance abuse program, High Focus Centers, recommended by Defendants.  (App. E to Rubin Cert.; Mollo Dep. 53:10, April 30, 2008.)

On November 2, 2005, Mollo reported to work and the PVSC administered a drug and alcohol test.  Mollo again tested positive for cocaine.  (App. H to Shah. Cert.)  Christiansen informed Mollo via letter dated November 7, 2005, that he was indefinitely suspended due to the positive November 2 drug test, based on violations of both the terms of the Stipulation and the PVSC Rules and Regulations.  (App. I.)  The letter informed Mollo that he was subject to immediate termination, pending discussion of the matter by the Commissioners on December 14, 2005.  (Id.)  Christiansen informed Mollo that he had the opportunity to attend an open session of the Commissioners on December 14 to discuss his situation before the Commissioners.  (Id.)  Mollo elected not to attend the session and the Commissioners decided to terminate him as of

December 15, 2005.  (App. J.)  Mollo eventually completed the substance abuse program, on

February 3, 2006.  (App. E to Rubin Cert.)

## II.    DISCUSSION

Principally, the issues presented by this Motion are whether Mollo's work duties should

be classified as safety sensitive, whether Mollo qualified as disabled when he was terminated,

whether Defendants violated any terms of the Stipulation, and whether there is any evidence of a

conspiracy on the part of the Commissioners.  Summary judgment is granted for Defendants on

all the claims.

Defendants argue the Court should grant summary judgment on Count One and Count

Two, which allege that the drug-testing policy constituted an unreasonable search and seizure,

because the PVSC's special need to protect its employees and the public justified the privacy

intrusion involved in random drug testing of its employees.  Defendants argue that Mollo's

position involved safety-sensitive duties that could potentially put Mollo, his co-workers, and the

public at risk of danger if he were to conduct those duties while under the influence of illegal

drugs.  Defendants argue that the Court should dismiss Count Three, which alleges Defendants

discriminated against Mollo based on a disability, because Mollo's continued drug use

disqualifies him from categorization as disabled.  As for the breach of contract claims, Counts

Four and Five, Defendants contend that the undisputed facts do not support a finding that

Defendants breached the Stipulation.

Mollo counters that Defendants exaggerate by characterizing his job duties as safety

sensitive.  Rather, he was an unskilled employee who worked as a part of a team, was supervised

by superiors and safety officers, and did not deal with the public.  As for the discrimination

claim, Mollo argues that he did qualify as a disabled person because he was participating in a

drug rehabilitation program.  Defendants terminated him before he could complete the program successfully.  Regarding the contract claims, Mollo argues that the Defendants violated the Stipulation by calling him back to work before he had had a chance to rehabilitate.  Mollo did not present any opposition to summary judgment on Count Six, the claim for conspiracy.

**A.**     **Standard of Review**

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary.  Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just create "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are no issues that require a trial, then judgment as a matter of law is appropriate.

**B.      Counts One and Two:  Search and Seizure**

Mollo claims, pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, that the Defendants' random drug testing policy, as applied to him, constituted an unreasonable search and seizure in violation of his rights under the Fourth and Fourteenth amendments to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution.  As a preliminary matter, the Court notes first that it will address Mollo's § 1985 claim for conspiracy to interfere with his civil rights, in a separate section below.  Second, Mollo does not address § 1988 at any point in his opposition papers and § 1988 does not create a separate cause of action,[7] so the Court need not further address its reference in the Complaint.  Thus, the Court will construe Count One as alleging solely a § 1983 claim for infringement of Mollo's Fourth and Fourteenth Amendment rights and Count Two as a claim for the violation of the Paragraph 7 of the Constitution of New Jersey.

A prima facie case under § 1983 requires the plaintiff to demonstrate:  (1) a person deprived him of a federal right; and (2) the person who deprived him of a federal right acted under color of state or territorial law.  There is no question that the Commissioners were acting under color of state law.  See Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 935 n.18 (1982) ("[S]tate employment is generally sufficient to render the defendant a state actor.").  Thus, the question is whether the Commissioners, through the random drug testing policy they instituted,

_____

[7] Rather, § 1988 pertains to the application of state and common law provisions in civil rights suits where no federal provision is suitable, attorneys fees for the prevailing party in certain civil rights and other actions, and expert fees in certain actions.

deprived Mollo of his right to be free from unreasonable searches and seizures.

Both Paragraph 7 and the Fourth Amendment, which contain virtually identical language,[8] prohibit unreasonable search and seizures by government agents.  See, e.g., Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 619 (1989), New Jersey Transit PBA Local 304 v. New Jersey Transit Corp., 151 N.J. 531, 544 (1997).  It is well established that the government's collection and testing of an employee's urine constitutes a search under the Fourth Amendment and Paragraph 7.  See Skinner, 489 U.S. at 617; Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989); PBA Local 304, 151 N.J. at 544.  Whether a search is unreasonable "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."  Skinner, 489 U.S. at 619 (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).

In the companion cases Skinner and Von Raab, the Supreme Court of the United States discussed the circumstances in which the government may require warrantless drug testing of public employees without probable cause or individualized suspicion of drug use.  The Supreme Court noted that "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal needs for law enforcement, it is necessary to balance the individual's privacy

---

[8] The Fourth Amendment to the United State Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Paragraph 7 of the New Jersey Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the papers and things to be seized.

expectations against the government's interests" to determine whether the warrant and probable cause requirements are impracticable.  Von Raab, 489 U.S. at 665.

Although in certain circumstances in cases implicating the Fourth Amendment and Paragraph 7 rights, the New Jersey courts have found that Paragraph 7 affords greater protection against unreasonable searches and seizures than does the Federal Constitution, in the context of drug testing programs of public employees, the Supreme Court of New Jersey has adopted the special needs standard, set forth by the Supreme Court in Skinner and Von Raab, as a useful analytical framework for considering the protections of Paragraph 7.  PBA Local 304, 151 N.J. at 553-59 (finding a special governmental need supported suspicionless drug tests of New Jersey Transit police officers because they discharge safety sensitive duties, including performing police-like duties in stations and on trains, carry firearms, and often work independently).  The special needs balancing approach is necessarily a fact-intensive inquiry.  Therefore, the Court will begin by reviewing the relevant cases that have considered the constitutionality of drug testing policies.

Applying the special needs standard, the Court in Skinner upheld the Federal Railroad Administration regulations requiring blood and urine testing of railroad employees who are involved in certain train accidents and permitting railroads to administer breath and urine tests to employees who violate certain safety rules.  489 U.S. at 606.  The Supreme Court found that the privacy interests of the affected employees, who were engaged in handling orders concerning train movements, operating crews, and in the maintenance and repair of signal systems, were "diminished by reason of their participation in an industry that is regulated pervasively to ensure safety."  Id. at 627.  On the other side of the scale, the Supreme Court found that the government's interests in testing without individualized suspicion were compelling.  Id. at 628.

Employees subject to the testing engage in safety sensitive tasks and "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." Id. Much like persons who have routine access to dangerous nuclear power facilities, covered employees are those that "can cause great human loss before any signs of impairment become noticeable to supervisors or others." Id. The Court observed that the regulations "supply an effective means of deterring employees engaged in safety-sensitive tasks from using controlled substances or alcohol" and "help railroads obtain invaluable information about the causes of major accidents and to take appropriate measures to safeguard the public." Id. at 630.

In Von Raab, the Court upheld a Customs Service program requiring urinalysis of employees seeking transfer or promotion to positions that are directly involved in drug interdiction or that require the carrying of firearms. 489 U.S. at 677. In examining the interference with the individual privacy of those employees, the Court noted that Customs employees who carry firearms or are directly involved in drug interdiction, like employees of the United States Mint, the military, or intelligence services, have a diminished expectation of privacy with respect to reasonable searches, due to the type of public duties they discharge. Id. at 671. The Court observed that "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness." Id. at 672. The Court found that the employees' diminished interests were outweighed by the government's compelling interest "in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." Id. at 670. Specifically, the "national interest in self-protection could be irreparably damaged if those charged with safeguarding it were, because of

their own drug use, unsympathetic to their mission of interdicting narcotics." Id.  As for the employees whose duties require the carrying of firearms, the Court observed that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force."

In Chandler v. Miller, 520 U.S. 305 (1997), the Supreme Court struck down a Georgia statute that required candidates for designated state offices to certify that they had taken a drug test and that the test results were negative.  Id. at 309.  The Supreme Court held that the public officials' drug use did not pose a concrete and substantial danger to the public sufficient to warrant a suspicionless search of all candidates for public office, even when the drug testing mandated by the statute was minimally intrusive.  Id. at 529.  The Supreme Court noted that the certification "is not well designed to identify candidates who violate antidrug laws" or "to deter illicit drug users from seeking election to state office." Id. at 319.  Unlike the employees in Von Raab, whose demeanor it was infeasible to scrutinize on a day-to-day basis based on the unique work environment, candidates for public office are subject to relentless scrutiny by their peers, the public, and the press.  Id. at 322.

In Wilcher v. City of Wilmington, 139 F.3d 366, 370 (3d Cir. 1998), the Court of Appeals for the Third Circuit considered whether the City's method of testing firefighters for drug use—visual observation of the firefighters while they provide their samples—constituted an unreasonable Fourth Amendment search.  The Court of Appeals affirmed the district court's assessment that firefighters enjoy only a diminished expectation of privacy, because they are in a highly regulated industry and their duties involve safety concerns of which the firefighters are well aware.  Id. at 374-75.  The Court of Appeals noted that the government interest in ensuring public safety posed a significant concern; a firefighter whose drug use is undetected is a source

of danger to himself, his colleagues, and to the community at large.  Id. at 375.  The Court of Appeals has also found random drug testing programs constitutional based on the safety sensitive nature of the duties of police officers, Policeman's Benevolent Ass'n, Local 318 v. Washington Twp., 850 F.2d 133, 135 (3d Cir. 1988) ("[police officers] exercis[e] the most awesome and dangerous power that a democratic state possesses…the power to use force to arrest and detain [citizens]"), and railway operating personnel, Transport Workers' Union of Philadelphia, Local 234 v. Se. Pennsylvania Trans. Auth., 884 F.2d 709, 712 (3d Cir. 1989) (finding that government presented evidence of severe drug abuse problem, safety hazards caused by employee drug use, and a testing program carefully tailored to the government's concerns).

In Bolden v. Se. Pennsylvania Transp. Auth., 953 F.2d 807, 823-24 (3d Cir. 1991), the Court of Appeals found that the random drug testing of a train depot maintenance custodian was unconstitutional because no dangers presented by the custodian's job gave the governmental entity a special need to conduct the search.  The Court of Appeals found that there is no reason that custodians would have a diminished expectation of privacy, since their positions are not pervasively regulated.  Id. at 823.  The custodian's duties included traveling through the train system to clean facilities and equipment.  Id. at 823.  The Court of Appeals found that the government interest was far from compelling, since there was no evidence that the custodian position posed any unusual degree of danger to others.  Id.  The Court noted that the main thrust of the Authority's arguments were not that the custodian's duties posed a risk to others, but that the custodian himself might be injured at the train depot were his faculties impaired by drug use. Id.  The Authority cited one accident that had occurred at the depot several years before and focused on several hazards at the depot, such as open pits, the partially exposed third rail, and trains that enter and leave the depot at speeds of up to 18 miles per hour.  Id.  The Court

18

observed that those facts showed a workplace that was no more markedly dangerous than "countless other industrial or transportation facilities." Id. at 824.

In Stanziale v. County of Monmouth, 884 F. Supp. 140, 146 (D.N.J. 1995), the Court found unconstitutional the pre-employment drug testing of a sanitary inspector for the County Board of Health, since any threat of harm to the public potentially caused by the inspector's impairment was neither immediate nor direct. The Court noted that although it was conceivable that an error committed by a sanitary inspector could have a negative impact on public safety, the nexus between any misconduct of the inspector and the potential injury to the public caused by the issuance of a satisfactory assessment to a restaurant that in fact is not in compliance with the health and sanitary laws was too attenuated to justify the intrusive random drug testing. Id. at 147. The Court distinguished the duties of the sanitary inspector from the duties of a hazardous materials inspector, American Fed'n of Gov't Employees v. Skinner, 885 F.2d 884 (D.C. Cir. 1989), cert. denied, 495 U.S. 923 (1990). In that case, the Court of Appeals for the District of Columbia Circuit found that the duties of a hazardous materials inspector, which included exposure to "poisonous, explosive, and highly flammable commodities that could be…suddenly ignited by improper handling," posed a risk of harm to the public. American Fed'n of Gov't Employees, 885 F.2d at 891.

Even taking the facts in the light most favorable to Mollo, summary judgment is appropriate on Count One and Count Two because Mollo's privacy interests are outweighed by the government's interest in its random drug testing policy.

Mollo's privacy interests are diminished due to his participation in a regulated industry and because his duties involve safety concerns, of which Mollo would have been aware. See Skinner, 489 U.S. at 627; Wilcher, 139 F.3d at 374-75. The PVSC is regulated by the

19

Occupational Safety and Health Administration and Environmental Protection Agency, and some employees' activities—though not Landscapers'—are regulated by the Department of Transportation.  (Mayo Dep. 15:9-11.)  A Landscaper would have been aware that his job duties involve safety concerns.  Landscapers are tested on the information they learn at training sessions in hazardous substances, emergency preparedness, confined spaces entry, and fire prevention.  Landscapers are required to read meters that are placed in plain view to warn them of any danger to breathing the air in a given area.  Landscapers are trained to operate a Tri-Tector recorder so that when a maintenance crew is entering an enclosed space, a trained employee can measure for airborne toxins.  (Marshall Aff. ¶ 12.)  Even if, as Mollo contends, he had "no recollection of ever having utilized the testing of airborne toxins" or other similar safety-related skills, (Mollo Aff. ¶ 6.), the PVSC had trained him in those techniques and could have required him to utilize that training at any time.  Additionally, the Landscaper job description states that a Landscaper "[m]ust be available for emergencies or job assignments on a 24 hour basis," and "[m]ust be in good health and free from any disabling…defects…which might endanger the health and safety of oneself or others."  The nature of the industry, the training in safety procedures that Mollo was required to undergo, and the job description itself would have made Mollo aware that his job involved safety concerns, thus giving him a diminished expectation of privacy.

On the other side of the calculus, the government's interest in suspicionless drug testing of Landscapers like Mollo is weighty, since landscaping duties at the PVSC involves the use of and close contact with machinery that can pose a danger to other employees and the public, and because Mollo sometimes performed his job duties alone and without supervision.

Although the main thrust of Mollo's job duties was not to safeguard the public, like those

of police officers, <u>Policeman's Benevolent Ass'n</u>, 850 F.2d at 135, or firefighters, <u>Wilcher</u>, 139 F.3d at 374-75, Mollo did "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." <u>See Skinner</u>, 489 U.S. at 628. Mollo drove trucks throughout the facility and operated other vehicles, like snow plows.  As the Southern District of New York has stated, "[l]ike a gun, a motor vehicle on a public motorway can instantly become a deadly instrument if misused." <u>Burka v. New York City Transit Authority</u>, 739 F. Supp. 814, 822 (S.D.N.Y. 1990).  Although Mollo did not customarily operate vehicles on public roadways, an impaired Landscaper driving snow plows or trucks on the extensive roadways of the PVSC facility poses a substantial risk of danger to co-workers or business invitees who may be on or near the facility's roadways.

Additionally, Landscapers are required to work in the close vicinity of a cryogenic plant, electrical substation, clarifiers, and Archimedes screw pumps.  Each poses a unique risk to the unwary Landscaper, as well as to co-workers and the public.  A Landscaper could be crushed by or drown in the clarifiers or Archimedes screw pumps, or electrocute himself if exposed to "buss work" outside of the electrical substation.  A Landscaper who inadvertently created a spark or flame near the stored oxygen in the cryogenic plant could cause an explosion, resulting in death or injury to any person in the vicinity.  Major damage to the facility would interrupt waste treatment service for PVSC's 1.3 million customers.

Mollo urges the Court to analogize the nature of the Landscaper duties to those of the custodian in <u>Bolden</u>, 953 F.3d at 823, whose duties the Court of Appeals found did not involve duties of a safety-sensitive nature.  In <u>Bolden</u>, 953 F.3d at 823, the Court of Appeals held that the Transportation Authority had no special reason to subject a custodian to a drug test based on the dangers of his job, which he performed at a train depot and throughout the transportation system.

The government had focused on the dangers inherent in the workplace site, such as such as open pits, the partially exposed third rail, and trains that enter and leave the depot at speeds of up to 18 miles per hour.  In its argument, the Transportation Authority emphasized the potential harm that the plaintiff could do to himself, were he impaired in such a dangerous workplace.  Id. at 824. The Court of Appeals in Bolden held that "[n]either the Supreme Court nor this court has endorsed the proposition that compulsory, suspicionless drug testing may be conducted to prevent an employee from causing harm to himself, rather than to others."  Id. at 823.   Although the Defendants here similarly focus a great deal on the harm that an impaired Landscaper could do to himself, they have also described the risk that an impaired Landscaper could inflict death or injury on others, making the duties of the custodian in Bolden, who was only responsible for cleaning the train depots and trains, distinguishable from the duties of a Landscaper at the PVSC. Unlike the custodian, some of Mollo's duties do present a risk of harm to others.  Mollo was responsible for driving vehicles and snow plows in the facility and for landscaping near machinery that, if exposed to a spark or flame, could cause an explosion that would endanger many people.  Mollo could also cause harm to others if he improperly read a meter or Tri-tector recorder, and as a result wrongly informed his co-workers that it was safe to enter an area of the plant that was in fact filled with toxic gas.

Mollo also contends that the risk of harm to the public posed by an impaired Landscaper is too attenuated.  In Stanziale, 884 F. Supp. at 146, the Court noted that although it was conceivable that an error committed by a sanitary inspector could have a negative impact on public safety, the nexus between any misconduct of the inspector and the potential injury to the public caused by the issuance of a satisfactory assessment to a restaurant that in fact is not in compliance with the health and sanitary laws was too attenuated to justify the intrusive random

drug testing.  Id. at 147.  Similarly, in the present matter, the risk that Mollo could cause an explosion that would effectively halt sewage treatment to the PVSC's 1.3 million customers is an attenuated one.  However, the other dangers that an impaired Landscaper could create, as described above, are direct rather than remote, so the duties of a Landscaper are distinguishable from those of a sanitary inspector.

A final factor that Mollo calls the Court's attention to is the element of supervision. Supervision or regular work in teams can obviate the need for suspicionless drug testing.  C.f. Skinner, 489 U.S. at 628 ("Much like persons who have routine access to dangerous nuclear power facilities…employees who are subject to certain testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others.").  The parties agree that Landscapers sometimes work in teams or alongside co-workers, but that Landscapers also sometimes perform job duties alone.  Specifically, Mollo sometimes operated the PVSC trucks alone and was customarily alone when operating snow plows.  Thus, there were times when supervisors and co-workers would not be present to detect signs of impairment before a Landscaper like Mollo could cause great human loss.

The Court finds that the PVSC's interest in requiring Mollo to submit to a random drug test, in order to ensure the safety of its employees and the public, outweighs his diminished expectation of privacy.[9]  The Court will grant summary judgment for Defendants on Counts One and Two.

**D.      Count Three:  Law Against Discrimination**

---

[9] Additionally, even if the Court had found that Mollo's expectation of privacy outweighed the government's interest in suspicionless drug testing, the Commissioners would have been entitled to qualified immunity.  Qualified immunity from suit is applicable unless the official's conduct violated a clearly established constitutional right.  Pearson, 129 S. Ct. at 816.  The right of a public employee with duties like Mollo's not to be subjected to suspicionless drug testing is far from clearly established.  Therefore, the Commissioners are immune from suit for their decision to implement the policy of randomly drug testing Landscapers.

Mollo alleges that Defendants violated New Jersey's Law Against Discrimination ("LAD"), N.J. Stat. Ann. § 10:5-1 to 42, on the basis that his drug dependence constituted a handicap protected by LAD and his termination on the basis of drug use was an unlawful employment practice.  The Defendants contend that drug dependence is not a handicap New Jersey courts recognize as protected by LAD.  The Defendants are correct.

The LAD prohibits unlawful discrimination or unlawful employment practices against a person on the basis of a current or previous disability.  N.J. Stat. Ann. 10:5-4.1.  The LAD defines a "disability" in the following manner:

> "Disability" means physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.

N.J. Stat. Ann. 10:5-5(q).  The courts of New Jersey have construed the LAD liberally since it is remedial social legislation.  Bosshard v. Hackensack Univ. Medical Ctr., 345 N.J. Super 78 (App. Div. 2001) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 590 (1988).  The LAD does not define all of the specific conditions that fall within its sweep.  Id.  The Supreme Court of New Jersey has instructed that courts should look to federal law as a key source of interpretive authority for the LAD.  Bosshard, 345 N.J. Super at 88 (citing Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97 (1990)).  Specifically, the Superior Court of New Jersey, Appellate Division, has determined that the approach of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12114, provides a sensible and fair framework for determining when drug addiction

should qualify as a disability.  Bosshard, 345 N.J. Super at 88-89.  Section 12114 of the ADA

states, in pertinent part:

> (a) Qualified individual with a disability. For purposes of this title, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.
>
> (b) Rules of construction. Nothing in subsection (a) shall be construed to exclude as a qualified individual with a disability an individual who—
>
> > (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> > (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
> > (3) is erroneously regarded as engaging in such use, but is not engaging in such use;
>
> except that it shall not be a violation of this Act for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

42 U.S.C. § 11214.  Under this framework, it is clear that at the time of his suspension and

subsequent termination, Mollo did not qualify as disabled.  Defendants allowed Mollo to attend

an outpatient rehabilitation program.  However, on November 2, after having enrolled in the

program, Mollo returned to work and again tested positive for cocaine.  At that point, although

he was enrolled in a drug rehabilitation program, he was still engaging in the illegal use of drugs.

Mollo does not dispute the accuracy of the drug test results.  Therefore, he did not qualify as a

protected person when he was suspended and subsequently terminated because he was "currently

engaging in the illegal use of drugs," and the PVSC "act[ed] on the basis of such use."  Id.  The

Court will grant summary judgment for the Defendants on Count Three.

**C.      Count Six:  Conspiracy**

Count Six of the Complaint claims that Defendants conspired to violate his civil rights,

pursuant to §§ 1983 and 1985. [10]  The Court will dismiss this Count because Mollo failed to address the conspiracy claims at all in his opposition papers and further because the Court finds these claims are legally insufficient.

The Court will take each conspiracy claim in turn.  To state a claim under § 1985(3), a plaintiff must show:  (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.  Farber v. City of Paterson, 440 F.3d 131, 135 (3d Cir. 2006).  A § 1985(3) claim must be based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action" in order to state a claim.  Id. (quoting Griffin v. Breckenridge, 403 U.S. 88 (1971).  Mollo has not raised any evidence to defeat summary judgment on this claim.  Nor has Mollo claimed that any action taken against him was based on some class-based invidiously discriminatory animus.  Mollo has identified no class of which he is a part.  See Farber, 440 F.3d at 137.   Therefore, the § 1985(3) conspiracy claim against the Commissioners fails.

The Court will now turn to the § 1983 conspiracy claim.  In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right.  Ridgewood Bd. of Educ. v. N.E. ex rel.

---

[10] § 1985(3) states, in relevant part:  "[i]f one or more persons...conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws…in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

M.E., 172 F.3d 238, 245 (3d Cir. 1999).  Unlike a § 1985(3) claim, a § 1983 conspiracy claim does not require that the conspiracy be motivated by invidious discrimination.  Id.   However, again, Mollo did not allege the claim with any specificity, nor did he raise any evidence or arguments to defeat summary judgment on the § 1983 conspiracy claim.  Therefore, the Court will dismiss this portion of Count Six, as well.  Summary judgment for Count Six is granted for Defendants.

**E.      Counts Four and Five:  Contract Claims**

Counts Four and Five are claims for breach of contract and breach of the implied covenant of good faith, respectively.  Mollo clarified in his brief, (Pl. Opp'n Br. at 16.), that these contract claims are based on the Stipulation executed by Mollo and the Human Rights Director before two witnesses on October 25, 2005, following Mollo's first positive drug test.  Specifically, Mollo claims that Defendants breached the Stipulation "by calling the plaintiff back into work before he had a chance to rehabilitate and before he had been tested clean."  (Id.)  The facts relevant to this claim are undisputed so the Court can rule on this contract interpretation issue as a matter of law.  The Court will grant summary judgment for the Defendants on Count Four and Count Five.

To state a claim for breach of contract under New Jersey law, the following elements are necessary:  (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) plaintiff performed his own contractual duties.  See Nat'l Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204, 222 (D.N.J. 2009).  It is undisputed that the Stipulation constituted a valid contract between the PVSC and Mollo.  Mollo claims that Defendants breached the Stipulation "by calling the plaintiff back into work before he had a chance to rehabilitate and before he had been

tested clean." (Pl. Opp'n Br. at 16.)

Contracts should be construed according to the plain and ordinary meaning of their terms. J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 364 (3d Cir. 2004). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." Bohler-Uddeholm, Inc. v. Ellwood Group, 247 F.3d 79, 93 (3d Cir. 2001) (internal quotations and citations omitted). Thus, the Court must give force to the intent of the parties by interpreting the contract according to the plain meaning of its terms. Gleason v. Nw. Mortgage, Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If contractual language is "subject to only one reasonable interpretation," summary judgment may be appropriate. Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999). To state the converse, a contract is ambiguous if it is "susceptible of more than one meaning." Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (quotation omitted). If the meaning of a contract is ambiguous, it is not subject to summary judgment.

Two terms are relevant to Mollo's claims. The first relevant term, which appears in Paragraph Three of the Stipulation, states:

> [Mollo] further agrees that he shall be subject to random drug testing on a more frequent basis than the general PVSC safety sensitive population, and that should he fail a drug test or fail to report for any recommended treatment, or should he fail to faithfully carry out any programs or directives dictated by the Employee Assistance Program, he will be subject to immediate termination.

The second relevant term, which appears in Paragraph Four of the Stipulation, states:

> If Mr. Mollo agrees to immediate drug and alcohol tests by PVSC's doctors, and if those tests are negative, he will be permitted to return to work on Wednesday, November 2, 2005, subject to the ratification by the Commissioners of his right to do so.

These terms lend themselves to only one reasonable interpretation. The first term clearly states,

in relevant part, that "should Mollo fail a drug test…he will be subject to immediate termination."  The second term states that Mollo "will be permitted to return to work on Wednesday, November 2, 2005," contingent upon three circumstances:  (1) "Mollo agrees to immediate drug and alcohol tests by PVSC's doctors," (2) "those tests are negative," and (3) the Commissioners ratify the terms of the Stipulation.  The Commissioners' ratification is not at issue here.  Paragraphs Three and Four, read in conjunction, indicate that if Mollo failed any drug test, he would be subject to immediate termination.  The November 2nd drug test was no exception.  Rather, the agreement conditioned his return to work on November 2nd, in part, on negative drug test results.  Thus, Defendants' termination of Mollo based on the positive November 2nd result was consistent with the contract terms.  Mollo's assertion that the agreement provided that he be allowed to complete a rehabilitation program before any further job action was taken finds no support in the four corners of the Stipulation.  The Stipulation does not contain any provision that can be construed to mean that Mollo would not be drug tested until he had completed the rehabilitation program.  Defendants' termination of Mollo comports with the terms of the agreement, so Mollo's breach of contract claim must fail.  The Court grants Defendants' request for summary judgment on Count Four.

The Court turns now to Count Five for breach of the implied covenant of good faith and fair dealing.  The Supreme Court of New Jersey has consistently held that all contracts contain an implied covenant of good faith and fair dealing.  Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005); Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001); Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997).  "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing anything which will have the effect of destroying or injuring the right of the other party to receive the benefits of

the contract." <u>Brunswick Hills</u>, 182 N.J. at 224 (quoting <u>Palisades Props., Inc. v. Brunetti</u>, 44

N.J. 117, 130 (1965) (internal quotation marks omitted)).  "Good faith conduct is conduct that

does not 'violate community standards of decency, fairness or reasonableness.'" <u>Id.</u> (quoting

<u>Wilson</u>, 168 N.J. at 245).  Proof of "bad motive or intention" is essential to a cause of action for

breach of the covenant of good faith and fair dealing.  <u>Id.</u> at 225.  The party claiming a breach of

the covenant "must provide evidence sufficient to support a conclusion that the party alleged to

have acted in bad faith has engaged in some conduct that denied the benefit of the bargain

originally intended by the parties."  <u>Id.</u> (quoting 23 Williston on Contracts § 63:22, at 513-14

(4th ed. 2002) (footnotes and internal quotation marks omitted)).  Additionally, "subterfuges and

evasions" in the performance of a contract violate the covenant even if the actor believes his

conduct is justified.  <u>Id.</u> (citing Restatement (Second) of Contracts § 205 cmt. d).  The covenant

of good faith and fair dealing may be breached even though the express terms of the contract are

not violated, <u>id.</u> at 226 (citing <u>Sons of Thunder</u>, 148 N.J. at 423), but the covenant cannot

override an express term in the contract, <u>Sons of Thunder</u>, 148 N.J. at 419.

Put differently, "[a] party to a contract breaches the covenant if it acts in bad faith or

engages in some other form of inequitable conduct in the performance of a contractual

obligation."  <u>Black Horse</u>, 228 F.3d at 288.  Thus, a showing of bad faith by the breaching party

is the essential element of this claim.  <u>Wilson</u>, 168 N.J. at 251.  A party "may be entitled to relief

under the covenant if its reasonable expectations are destroyed when a defendant acts with ill

motives and without any legitimate purpose."  <u>Brunswick Hills</u>, 182 N.J. at 226 (citing <u>Wilson</u>,

168 N.J. at 251).  As the Supreme Court of New Jersey explained in <u>Wilson</u>, a party does not

breach the implied covenant of good faith and fair dealing merely because its decisions

disadvantaged another party, and "contract law does not require parties to behave altruistically

toward each other."  168 N.J. at 251 (internal quotation marks and citation omitted).  For

example, in Brunswick Hills, the plaintiff, a tenant, wished to exercise an option to purchase a

ninety-nine-year lease from the defendant.  182 N.J. at 214.  More than a year in advance of the

deadline to exercise the option, the plaintiff notified the defendant, in writing, of its intent to

purchase the ninety-nine-year lease, but, under the mistaken belief that the purchase price was

not due until the time of closing, did not tender the purchase price.  Id. at 229.  As a result,

execution of the option remained unperfected.  Id.  During the following nineteen-month period,

defendant, through its agents, "engaged in a pattern of evasion, sidestepping every request by

plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to

move forward on closing the ninety-nine-year lease."  Id.  The plaintiff's attorneys reached out to

defendant and its representatives repeatedly in letters and telephone calls regarding exercising

the lease option, but to no avail.  Id.  The plaintiff even averred in an estoppel certificate in

support of the defendant's application for a bank loan that it had "exercised its option to convert

lease to a fully prepaid 99 year lease . . ."  Id.  But the defendant never challenged that formal

declaration.  Rather, as the defendant admitted, it was not in its economic interest to allow the

exercise of the option, so it waited until after the deadline to exercise the option had passed and

responded to the plaintiff that the option had expired.  Id. at 229-30.  The Supreme Court of New

Jersey held that the defendant had breached the covenant of good faith and fair dealing through

"a demonstrable course of conduct [consisting of] a series of evasions and delays, that lulled

plaintiff into believing it had exercised the lease option properly."  Id. at 231.

Mollo claims that "it is clear that by not allowing the plaintiff the right to finish his

rehabilitation before terminating him that the defendants acted in bad faith and frustrated the

agreement they imposed."  However, the covenant of good faith cannot override an express term

in the contract.  <u>Sons of Thunder</u>, 148 N.J. at 419.  The Stipulation expressly provided that "should Mollo fail a drug test…he will be subject to immediate termination" and that Mollo would "be permitted to return to work on Wednesday, November 2, 2005" if he agree[d] to immediate drug and alcohol tests by PVSC's doctors" and "those tests [were] negative." Therefore, PVSC's drug testing of Mollo on November 2nd, on the date slated for him to return to work on a probationary basis by the Stipulation, and the PVSC's termination of his employment on the basis of the positive results, was expressly authorized by the Stipulation. Further, Mollo has patently failed to allege any bad faith on the part of Defendants following the first positive drug test result.  Rather, Defendants acted in good faith when they gave Mollo multiple opportunities to reform and retain his employment with the PVSC, offering Mollo qualified reinstatement based on the terms of the Stipulation, offering counseling by the Employee Assistance Program, and giving Mollo an opportunity to speak with the Commissioners regarding his situation at an open session on December 14th.  This claim must be dismissed as legally insufficient.  The Court will grant summary judgment to Defendants on Count Five.

### III.    Conclusion

For the foregoing reasons, the Defendants' motion is granted for all six counts.  Summary judgment is granted for Count One and Count Two since the Court finds that even taking the facts in the light most favorable to Mollo, his job duties were safety sensitive, for Count Three because Mollo did not qualify as disabled due to his continued drug use, and for the Count Four, Five and Six because those claims are legally insufficient.  The court will enter an order implementing this opinion.

                                    _____ s/ Dickinson R. Debevoise _____
                                              Dickinson R. Debevoise, U.S.S.D.J.
Dated:  December 30, 2009